UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| INTERGROUP CORPORATION | § | |
| *Plaintiff*, | § | |
| | § | |
| vs. | § | Civil Action No. 4:26-cv-1257 |
| | § | |
| CONVEX INSURANCE UK LIMITED and | § | |
| PALMS INSURANCE COMPANY, LTD | § | |
| *Defendants*. | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

**COMES NOW** Plaintiff, Intergroup Corporation, by and through its undersigned counsel, Todd Wells of Raizner Slania LLP, and for its causes of action against Defendants Convex Insurance UK Limited ("Convex") and Palms Insurance Company, Limited ("Palms") (collectively "Defendants" or "Carriers"), states and avers as follows:

## GENERAL ALLEGATIONS

1. At all times relevant to this action, Intergroup Corporation ("Intergroup") was and is a Delaware corporation with its principal place of business in Los Angeles, California.

2. At all times relevant to this action, Convex Insurance UK Limited ("Convex") was and is a foreign corporation conducting a systematic and routine business in the State of Missouri. Convex can be served with the Summons and Complaint by serving its registered agent **Locke Lord, LLP, 875 3rd Avenue, New York, NY 10022**.

3. At all times relevant to this action, Palms Insurance Company, Limited ("Palms") was and is a foreign corporation conducting a systematic and routine business in the State of Missouri. Palms can be served with the Summons and Complaint by serving its registered agent **Attn: General Counsel, Palms Insurance Company, Limited, 700 Universe Boulevard, Juno Beach, FL 33408**.

4.      This Court has original subject-matter jurisdiction over this action under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over Defendants pursuant to Missouri's long arm statute, RSMo. §506.500.1, in that Defendants transacts business within this State and made a contract within this State.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that a substantial part of the events giving rise to Plaintiff's claims occurred in this District and the insured Property that is the subject of this action is situated in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

7.      This suit arises from Defendants' wrongful acts in handling Intergroup's wind and hail claim under its Insurance Policies (the "Policies") involving damage to its multi-building apartment complex known as Des Arboles Apartments located at 3209 Cross Keys Drive, Florissant, Missouri (hereafter "the Property").

8.      The Policies sold to Intergroup bear Policy numbers CPR000480-0724 (Convex) and PLM-00860-24 (Palms) and provide coverage for Plaintiff's apartment complex located at 3209 Cross Keys Drive, Florissant, Missouri. Copies of the Policies are attached as **Exhibit A** and **Exhibit B** respectively.

9.      The Policies provide coverage for damage to the Property caused by wind and/or hail.

10.     On or about March 14, 2025, a wind and hailstorm struck Florissant, Missouri, causing damage to Intergroup's Property.

11. The storm produced significant hail in addition to winds ranging from 85 to 95 miles per hour. The storm included an EF2 tornado near the property.

12. The damage involved, but was not limited to, the roof systems, interior, exteriors, windows and more.

13. Within two weeks of the storm event, Intergroup notified the Carriers to make a claim under the Policies and asked that Carriers cover the cost of repairing the property to its pre-storm condition.

14. The Carriers appointed Engle Martin to serve as adjusters on this matter. These appointments typically involve a delegation of certain adjustment responsibilities and authorities to the adjuster.

15. Engle Martin retained JS Held to then act as building consultants during the inspections.

16. Finally, after coordinating various schedules, the Carriers sent an adjuster to the Property for the first time on or about April 9, 2025.

17. The adjusting team for the Carriers then remained silent as they internally worked to minimize and downplay damage observed during the inspections.

18. After a month of waiting, Intergroup reached out to the Carriers to see if there was an update on the adjustment of the claim. The Carriers reported that they were still waiting on their own engineering team.

19. Finally in June, Engle Martin told Intergroup that it had supplied an engineering report to the Carriers for review. But even at that time Engle Martin still was waiting for its first estimate of actual damages sustained in the storm and it was in the process of trying to schedule follow up inspections for interior damage.

20. Despite an internal report showing significant storm damage—and despite secondary inspections to assess further elements of interior damage—the Carriers still refused to issue any form of advance payment.

21. During this process, Intergroup was forced to come out of pocket for emergency and temporary repairs.

22. On June 23, 2025—more than three months after the storm event—Engle Martin reported that it was still awaiting permission from the Carriers to even release and issue the estimate of damage. At that time, the interior damage was still under review.

23. Each time Engle Martin was pressed by Intergroup for moving slowly during the process, the defense was simply that the claim was large and involved 33 buildings.

24. But despite knowing the size of the claim and the property, the Carriers continued to refuse to commit adequate resources to the investigation of damage.

25. As a result, Engle Martin was unable to timely and accurately handle the investigation of the claim. And the Carriers dictated the entirety of the process to ensure it was a slow, ineffective, and improper process.

26. Moreover, the Carriers failed to adequately and timely issue payments and confirmations throughout the process, leaving Intergroup in the dark and coming out of pocket for temporary and emergency repairs.

27. Upon information and belief, the estimates were funneled through Engle Martin and issued to the Carriers for final "approval" and say in the process. Although the Carriers and Engle Martin gave no transparency to this process throughout the claim adjustment, it is clear that the Carriers failed to timely approve the estimates.

28.     On July 10, 2025—nearly four months after the storm event—the estimates still had not been released.

29.     Rather than providing clarity on how the process became derailed, the next communication came on July 14, 2025. Engle Martin supplied the first estimate (produced by JS Held). That estimate showed an RCV of $847,171.31 and an ACV of $656,395.03.

30.     Engle Martin issued a letter calculating the deductible and depreciation and reported a net payment of $341,715.11 would be paid.

31.     The first $75,000 was issued in a check dated June 26, 2025.

32.     The next $75,000 check was dated July 28, 2025, two weeks after the Carriers recognized $341,715.11 was due and owing.

33.     By July 31, 2025, Intergroup had already issued its full assessment of damage along with all the supporting backup.

34.     The Carriers, through Engle Martin, spent the next several months fighting Intergroup's evaluation of damage, refusing to pay the undisputed portion of damage in an effort to secure a complete settlement of the claim for less than the total amount that was owed.

35.     During that process, the carriers added small amounts to the undisputed damage, but still withheld payment.

36.     The *next* payment that came was for $185,655.79 and it was not issued until October 29, 2025. After more than seven months of claim adjustment, the carriers had finally paid more than 50% of the undisputed amount owed.

37.     Even under the Carriers' calculation of undisputed damage, an additional $185,655.79 was still owed.

38.     That final undisputed payment was not issued until February 12, 2026.

39.     The Carriers issued that payment through Sedgwick Delegated Authority. As above, the Carriers once again improperly tried to end the adjustment despite knowing Intergroup had pointed to additional and substantial storm damage. On that February 12, 2026, the Carriers wrote "Final Indemnity Payment" despite the claim remaining clearly open.

40.     It took eleven months for Intergroup to receive even the "undisputed" portion of the claim. And now the Carriers refuse to consider any additional damage that Intergroup continues to highlight.

41.     The loss is a covered peril under the Policies, and the Carriers have at no time identified any exclusion, condition, or other coverage defense justifying their refusal to pay the amount their own adjuster determined was owed.

42.     Before instituting this action, Plaintiff, through counsel, made written demand upon the Carriers by letter dated May 4, 2026 for the unpaid balance of the claim. More than thirty (30) days have elapsed since that demand, and the Carriers have failed and refused to pay.

43.     The Carriers continue to deny full coverage under the Policies and, as a result, Intergroup has been unable to have the apartment complex repaired.

44.     Due to the Carriers' conduct, Intergroup was required to retain an attorney to prosecute its claim for insurance benefits due under the Policies.

45.     The Carriers have delayed payment for Intergroup's necessary and covered Property repairs under the Policies. Given the repeated delays of payment, Intergroup has been subjected to significant economic impact and continuing damage to the Property. In addition, Plaintiff has suffered financial harm and damage as a result of the Carriers' denials and repeated delays.

46.     The significant effect of the Carriers wrongful conduct and unjustified delays, however, is still uncompensated.

## COUNT I - Breach of Contract

47.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 47, above, as though set forth fully herein.

48.     Defendants agreed to provide Plaintiff with insurance in exchange for payment of money.

49.     Plaintiff fulfilled all its obligations under the Policies, including the payment of certain premiums to secure insurance, or tendered performance pursuant to the contract.

50.     Defendants' refusal to pay claimed benefits in accordance with the Policies constitute a breach of contract.

51.     Plaintiff has suffered damages caused by Defendants' breach of contract.

WHEREFORE, Plaintiff prays for judgment against Defendants for damages that are fair and reasonable, for its costs incurred herein, and for all other damages and appropriate relief as the court deems fair and reasonable.

## RESULTING LEGAL DAMAGES

52.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 51, above, as though set forth fully herein.

53.     Plaintiff is entitled to the actual damages resulting from the Defendants' violations of the law.  These damages include the consequential damages to its economic welfare from the wrongful denial and delay of benefits; and the other actual damages permitted by law.  In addition, Plaintiff is entitled to exemplary damages.

54.     Plaintiff is entitled under law to the recovery of prejudgment interest at the maximum legal rate.

55.     Plaintiff is also entitled to the recovery of attorneys' fees.

WHEREFORE, Plaintiff respectfully requests that Plaintiff have judgment against Defendants for actual damages, pre- and post-judgment interest as allowed by law, costs of suit, punitive damages, and all other relief, at law or in equity, to which Plaintiff may be entitled.

### COUNT II – Vexatious Refusal
#### (RSMo. §§ 375.296, 375.420)

56.     Plaintiff incorporates by reference the allegations of paragraphs 1 through 55, above, as though set forth fully herein.

57.     Defendants have breached its contract of insurance in that it has wrongfully refused to pay the full amount of Plaintiff's loss under the Policies.

58.     The Policies are contracts of insurance covering property located in Missouri, issued to Plaintiff as a corporation authorized to do business in Missouri, within the meaning of RSMo. § 375.296.

59.     Plaintiff sustained a covered loss and made a claim, and the Carriers refused to pay the full amount of that loss.

60.     For more than six months, the Carriers refused to even pay the full "undisputed" amount of the loss.

61.     The Carriers' refusal was without reasonable cause or excuse. Their own retained adjuster valued the covered loss and determined the net amount due under the Policies, yet the Carriers refused to pay that amount and have identified no exclusion, condition, or bona fide dispute over the existence or extent of their liability to justify the refusal.

62.     The Carriers' refusal was further vexatious in that they unreasonably delayed payment over a period from March 2025 (claim submission) to February 2026 (when the final undisputed amount was finally issued).

63.     The Carriers further designated a partial payment "final" while their own adjuster's valuation reflected a greater sum owed and disregarded the proof of loss furnished by Plaintiff and its contractors.

64.     More than thirty (30) days before this action was instituted, Plaintiff made a fulsome demand for payment, and the Carriers failed and refused to pay in accordance with the Policies.

65.     Plaintiff is therefore entitled, in addition to the amount due under the Policies and interest, to damages for vexatious refusal of up to twenty percent of the first $1,500 of the loss and ten percent of the loss in excess of $1,500, plus reasonable attorney's fees, under RSMo. §§ 375.296 and 375.420.

66.     Defendants' refusal to attempt to effectuate a prompt, fair, and equitable settlement of a claim was willful and without reasonable cause or excuse, and Defendants' refusal to pay the claimed loss is without reasonable cause or excuse. Defendants' failure and refusal are, therefore, vexatious within the meaning of RSMo. §§ 375.296, 375.420.

**WHEREFORE**, Plaintiff prays for judgment against Defendants for the contracted coverages, plus statutory penalties under RSMo. §§ 375.296, 375.420 consisting of twenty percent of the first fifteen hundred dollars of the loss, and ten percent of the amount of the loss in excess of fifteen hundred dollars, for pre and post judgment interest as allowed by law, for costs incurred herein, for attorneys' fees as provided by RSMo. § 375.420, and such other damages as the Court deems fair and reasonable.


**ATTORNEY'S LIEN CLAIMED**
**JURY TRIAL DEMANDED**

Respectfully submitted,

**RAIZNER SLANIA LLP**

*/s/ Todd R. Wells* _____
Todd R. Wells
MO Bar ID: 69423
TX Bar ID: 24124620
2402 Dunlavy St., Suite 300
Houston, Texas 77006
Phone: 713-554-9085
Fax:   713.571.1148
twells@raiznerlaw.com

**ATTORNEY FOR PLAINTIFF**

## **JURY DEMAND**

*Plaintiff hereby demands a trial by jury, a right enshrined in the Constitution of the United States of America and the State of Missouri and preserved by the sacrifices of many.  The necessary jury fee has been paid.*

*/s/ Todd R. Wells* _____
Todd R. Wells